# CHARLESTON.

### STATE *v.* FRANK ZINN

Submitted October 30, 1923.　Decided December 4, 1923.

1. ·CRIMINAL LAW—*Instructions Based on Facts Not in Evidence Should Not be Given.*

   Upon a trial for voluntary manslaughter, it is error for

the lower court to give instructions to the jury based upon an assumption of facts which is not supported by the evidence in the case; such instructions, when calculated to mislead the jury to the prejudice of the accused, should not be given. (p. 154).

2. SAME—*Instructions as to Presumption of Intent From Manner of Killing not Based on Evidence Held Erroneous.*

Where the evidence tends to show that the deceased came to his death by being assaulted on the bank, and after the assault, was thrown into the river, where he drowned, and there is no evidence showing or tending to show that he came to his death in any other manner, it is error to instruct the jury that: "If they find from the evidence beyond all reasonable doubt, either from direct or circumstantial proof, that the defendant, while in the boat with the deceased, struck and thus knocked the deceased out of the boat and into the river, and as a result the deceased drowned; under the law the defendant is presumed to have intended to kill the deceased." (p. 154).

Error to Circuit Court, Taylor County.

Frank Zinn was convicted of voluntary manslaughter, and he brings error.

*Reversed and remanded.*

*J. Guy Allender* and *Robinson & Robinson,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

McGINNIS, JUDGE:

At the November term of the Circuit Court of Taylor County, Frank Zinn was indicted for Voluntary Manslaughter for the killing of Robert Woolard, on the....day of......, 1922, in said County. He was tried at said term, found guilty of Voluntary Manslaughter and sentenced, by the court, to serve four years in the State Penitentiary, and upon this verdict and sentence, the defendant brings this case here on a writ of error.

. The accused and deceased were friends; the deceased lived with his brother and sister in Fetterman, a suburb of the City of Grafton, and the accused lived, with his mother, in Grafton. They had been working together for De Moss, a

Justice of the Peace. The accused had been acting as Special Constable for De Moss, and the deceased had been doing some work on a house for De Moss. On the 12th day of June, 1922, both the accused and the deceased worked a part of the day on the house for De Moss; the accused quit at noon, and Woolard, the deceased, worked until near five o'clock, then went to his home, in Fetterman; they had agreed to take a boat ride down the river that evening. About six thirty, the accused appeared on the railroad in front of the house in which Woolard lived, and told the deceased, in a tone of voice that was heard by the deceaseds sister, that he was going down about the old brick yard to serve some papers; deceased told his sister that he was going down to the brick yard with this man, and that he was going to take the boat. He left the house with his two dogs, a large Shepherd and a small Fiste, took two pairs of oars and went toward the river where he found the defendant. They went down the river to a point a short distance below Coffman, which is some six miles from Fetterman. From this point, the important details of this trip to Coffman and return depends almost entirely upon the testimony of the accused, his statements are not contradicted by any direct evidence and the substance of his statements are: that he and the deceased and the two dogs got in the boat and each of the two men took a pair of oars and rowed down the river. After proceeding a short distance, to the first curve west of Fetterman, deceased called to a man on the bank, whom the accused did not know, and said, "Come on and take a ride with us." And he said, "All right." They took this man in the boat and proceeded down the river in the direction of Coffman, to which point the deceased insisted they should go, accused wanted to return because it was getting dark. This stranger claimed that he could not go to Coffman because he had passed a bad check down there and for that reason he did not want to go. He got out of the boat before they reached Coffman presumably to wait until they came back. At the pump station the deceased got out of the boat and went up over the track and was gone from 20 to 40 minutes, and he returned somewhat intoxicated.

Accused saw witness Jenkins down below this point, on the river, and they went down and took him in the boat. He assisted the accused to row the boat up to Miller's Landing, which is just opposite the station at Coffman, where Jenkins got out. There were only two men in the boat when Jenkins got in, the accused and the deceased. There were also two dogs in the boat. After Jenkins got out, the accused and deceased proceeded up the river in the direction of Grafton. At some point above Miller's Landing, they picked up the stranger; up to this point the accused and the deceased had rowed the boat, but when the stranger got in he took the oars and the deceased took the back seat and they continued up the river to the point where the boat capsized and the body of the deceased was found. They were seen on the river by a boy, and heard by his father, and another young man, who were in another boat with him, at some point between Coffman and the place where the body of the deceased was discovered, and the boat found; the boy said it looked to him like there were four men in the boat, and he heard a dog barking; it was dark and doubtless he saw this big shepherd dog and thought it was a man. They heard them swearing and one witness states that, from the noise they were making, he took them to be "pretty well drunk". The river was high and rising and there were boxes, crates, cross ties, and brush drifting down the river. The accused states that the deceased either stooped over to get some water or to vomit, and the boat turned over and threw all three of them in the water, and that something hit him in the head, and when he came to his senses, he was lying against the side of the river, that there was water coming up over his mouth and he was strangling; that he called and went back in the river and met the deceased and the dog coming; that he took hold of the deceased and the deceased took hold of him, and they held on to each other until he got the deceased out of the water and up on the bank about eight feet from the river. The other man had swum to the other side of the river and he *hollered*, "I am going home, I am freezing to death." The accused said to him, "You had better come and help to get

Bob out of the river''; that he *hollered* for help several times; that he tried to persuade the deceased to come on and go home and he would make no answer except that he said, ''I guess I can go back to Coffman if I want to.'' Accused left the deceased with his two dogs and went up the railroad track to the car barn, passing within less than 100 feet of the residence of the deceased. He had lost his cap and coat in the river. Accused stated that part of the time he knew what he was doing, and part of the time he did not. At 3:50 A. M. accused arrived at the car barn, he appeared to be drunk and was wet. The car barn foreman, Mr. Weekley, on being asked, ''What account did he give of himself?'' answered, ''He said he had been down to Coffman, he and Bob Woolard, and they were coming back in the boat, he said there were seven of them and two dogs and five gallons of whiskey, minus what they drank, and that the boat upset and he had one hell of a time getting them out of the water. He said he got five of them out and the other two he didn't know whether they got out or drowned.'' He said that he got the deceased out, and pulled him up on the bank, and the deceased tried to fight him, and the dog tried to fight him; that the dog bit him on the arm.'' Accused had a watch which had stopped at 4 minutes of eleven, it had water in the works, and presumably it stopped while accused was in the water.

The accused asked the witness Weekley four or five times after he arrived at the car barn, to call up the Woolards and tell them about the deceased; that he was drunk, and was down on the river bank at the point of Johnson's Straight; that if they did not look after him he would freeze. Weekley finally called the residence of the brother-in-law of the deceased and communicated these facts to Miss Huber, a niece of the deceased, who called the deceased's residence and told his brother of the accident. It appears that two witnesses heard someone calling for help several times about 11 o'clock on the night of June 12th, the sounds coming from near the point where the body of the deceased was found.

Accused went from the car barn to his home about five o'clock on the morning of the 13th of June; was sick and

went to bed, where he remained all day and was apparently not in his right mind at times. He requested witness Newport to go down and see if he could find the deceased. He went with the brother of deceased and searched for the deceased near the old brick yard, where accused told Newport the accident occurred, but failed to find any trace of him. He also states that the accused was in bed complaining of his head; that there was a bump on his head that looked like something had struck him. His mother's statements were to the effect that the accused arrived at home very early in the morning without coat or hat and that he was sick and appeared part of the time not right in his mind; that he remained in the house all day in that condition.

The body was found at the point described by the accused, between 7 and 8 o'clock on June 15th and when found was lying on its back with one foot in the water and the other foot across a willow twig, the head was on the bank practically at right angles with the river and the boat was found about ten or twelve feet opposite the body with its stern submerged and the bow protruding out of the water.

Witness McDaniel, who first discovered the body, and who examined it, and the ground where it was found, says that it appeared to him that the water had been up over it, and that there was a path up the bank where the weeds had been broken down. He said that this path led to the railroad, and that ''there was a place up above there where the dogs dug all around there; that was back away from the river, back from where Mr. Woolard laid, ten or twelve feet, that it looked like some one had taken him by the legs and arms and pitched him down over the bank.'' The evidence of Dr. Campbell, who examined the body at the undertaker's establishment, and who performed an autopsy on the body of the deceased, says in describing the injuries: ''The most marked injury was that of a broken nose, and the injury across the forehead over the left eye; there he was cut through to the skull, and on the right side of the neck there was quite a wound; the face on the right side was mutilated as if cut and bruised all over the surface of the face. ''The ears were cut, one was cut half way down along the skull, both were badly cut up'', and that these injuries were inflicted on the

body before it went into the water; that the blood clot and discoloration showed that they were recent, and that they were caused by numerous blows, and in speaking of the injuries to the ears said, "It looked like the marks on his face were all one, while those superfluous marks looked like he had been dragged, and that drowning was the immediate cause of his death." The coroner, Thayer, who describes what he saw on the ground where the body was found and the position of the body, says: "It looked to me like the man had been beaten to death and thrown into the river." The testimony of these three witnesses is the only evidence given that in any way relates to the manner in which deceased came to his death, or the point where the injuries were inflicted. These statements, taken in connection with those of the accused, and the time shown by the watch of the accused, show that deceased had remained at or near the point where the body was found, from about 11 o'clock on the night of June 12th until between 7 and 8 o'clock on the morning of June 15th. As to whether or not these facts sufficiently show the *corpus delicti* is not clear, but we are of the opinion that there were sufficient facts shown for the lower court to permit them to go to the jury on that point, and especially in view of the fact that the case must be reversed on other grounds; and there may be other evidence given in the case upon this question upon a new trial.

Instructions Numbers 4, 5 and 7 are all based on the assumption that the accused struck the deceased while in the boat, and that by reason of the blow, or blows, so struck, the deceased was knocked or thrown out of the boat into the river and was drowned.

There is no evidence to justify that assumption; on the contrary it appears from the evidence that the deceased came to his death by having been assaulted on the bank, and thrown into the river, where he was drowned. These instructions are objectionable for other reasons which we do not deem it necessary to discuss, having held that they are bad for the reasons stated. These instructions are not based on any evidence in the case, and they were calculated to mislead the jury. They were prejudicial to the accused and it was error

in the lower court to give them or either of them. *State* v. *Dickey,* 46 W. Va. 319; *State* v. *Greer,* 22 W. Va. 800.

Upon these grounds we reverse the judgment of the lower court, set aside the verdict of the jury, and award the defendant a new trial.

*Reversed and remanded.*