# CHARLESTON.

STATE v. JOHN NEWMAN.

(No. 5356.)

Submitted March 30, 1926.   Decided April 13, 1926.

1.  CRIMINAL LAW—*Admitting In Evidence Pieces of Glass Picked Up Outside House and Pieces Taken From Fireplace, Represented as Being Swept From Floor Under Window Through Which Accused Represented That Fatal Shot Had Been Fired by Some One Outside, Held Not Reversible Error.*

    While of little probative value on the guilt or innocence of the defendant charged with the murder of his father, the trial court committed no reversible error in admitting in evidence for the purpose of comparison, pieces of glass picked up on the outside of the house and pieces taken from the fireplace and produced to the officers by defendant's mother, which she represented she had swept up from the floor under the window through which defendant represented the fatal shot that killed deceased had been fired by someone from the outside.   (p. 363.)

    (Criminal Law, 16 C. J. § 1222.)

2.  SAME—*Evidence of Effect of Shots Fired Into Cardboard Target, if Made Under Proper Circumstances and Conditions, Should Not be Rejected Simply Because Experiments Were Not Made in Presence of Accused, or Because Not Made Pursuant to Some Order of Trial Court.*

    The evidence of experiments made, showing the effect of shots fired from a shot gun into cardboard targets, if made under proper circumstances and conditions, should not be rejected simply because not made in the presence of the defendant on trial charged with homicide, or because not made pursuant to some order of the trial court.   (p. 364.)

    (Criminal Law, 16 C. J. § 1094.)

3.  SAME—*When Experiment is Offered in Evidence, it Should be Shown That it Was Performed Under Condition Circumstantially Similar to Those Admitted or Proven to Have Existed, or in Disproof Thereof That Result Was Obtained Different From Alleged Fact by Experiment Performed Under Similar Conditions.*

    When, however, an experiment is offered in evidence in proof of an alleged fact, it should be shown that it was per-

formed under conditions substantially similar to those ad-
mitted or proven to have existed, or in disproof thereof, that
a result was obtained different from the alleged. fact by an
experiment performed under such similar conditions.    (p.
365.)

(Criminal Law, 16 C. J. § 1094.)

4.  SAME—*General Rule is That to Render Experiment Admis-
sible, Conditions Should be Substantially or Proximately
Similar, and That Similarity Need Extend Only to Those
Conditions Which Govern or Substantially Affect Result.*

While there is no fixed standard of determining the degree
of similarity required, the general rule is that the conditions
should be substantially or proximately similar, and that the
similarity need extend only to those conditions which govern
or substantially affect the result.    (p. 365.)

(Criminal Law, 16 C. J. § 1094.)

5.  SAME—WITNESSES—*Admissibility of Evidence, Based on Ex-
periments, Depends on Whether it Tends to Enlighten Jury
and Enable Them to More Intelligently Consider Issue;
Whether Evidence of Experiments is Admissible is, Under
Circumstances of Each Case, Preliminary Question for
Court in Exercise of its Discretion, to be Controlled on
Appeal Only When Abused.*

And the criterion for the admissibility of such evidence is
whether it tends to enlighten the jury and enable them the
more intelligently to consider the issue presented; and
whether or not such evidence of experiments is admissible, is,
under the circumstances of each case, a preliminary ques-
tion for the determination of the court in the exercise of its
discretion, to be controlled upon appeal only when abused.
(p. 365.)

(Criminal Law, 16 C. J. § 1094; 17 C. J. § 3582; Evidence, 22
C. J. §§ 843, 844.)

6.  SAME—*In Prosecution for Murder, Defended on Ground That
Deceased Was Killed by Firing Shotgun From Outside
House Through Window, Admitting Experiments Made by
Firing Shot Gun at Different Distances Held Abuse of.
Trial Court's Discretion.*

In, this case, that discretion, in the judgment of trial court,
for the reasons given, was wrongly exercised by the trial
court, in favor of the admission of experiments against the
defendant charged with the murder of his father.   (p. 367.)

(Criminal Law, 16 C. J. § 1094.)

7. SAME—*Accused's Introduction of Evidence Concerning Ex-*
   *periments Made With Shotgun, Brought Out on Cross-*
   *Examination of State's Witness, Not on Same Question as*
   *Evidence of Experiments by State, Was Not Waiver of*
   *Objection to State's Evidence of Experiments.*

   The defendant should not be regarded as having waived
   his objection to such evidence by himself introducing other
   evidence of similar character not on the same question, and
   particularly so where such evidence was brought out in cross-
   examination of the State's witness.   (p. 367.)

   (Criminal Law, 16 C. J. § 2217 [Anno].)

8. SAME—WITNESSES—*Hearsay Evidence is Generally Inadmis-*
   *sible; Hearsay Evidence, Offered to Convict One of Mur-*
   *der, and Brought Out on Cross-Examination of Accused's*
   *Witness on Subject Not Covered by Examination in Chief,*
   *is Inadmissible; if State Wishes to Examine Accused's*
   *Witness on Subject Not Introduced in Chief, Prosecutor*
   *Should Introduce Witness as His Own in Subsequent Pro-*
   *gress of Trial; in Prosecution of Son for Murder of Father,*
   *Cross-Examination of Accused's Witness by State as to*
   *Trouble Between Accused and Father When Accused Drew*
   *Knife on Father, of Which There Was No Other Evidence,*
   *Was Error.*

   Hearsay evidence is generally inadmissible, and especially
   so when offered to convict one of murder and brought out on
   cross-examination of defendant's witness on a subject not
   covered by the examination in chief. If the State in such a
   case should desire to examine the witness on a subject not
   introduced in chief the prosecutor should introduce the wit-
   ness as his own in the subsequent progress of the trial.   (p.
   368.)

   (Criminal Law, 16 C. J. § 1233; Witnesses, 40 Cyc. pp. 2501,
   2504.)

9. SAME—*Instructing Jury on Proposition Supported by no Evi-*
   *dence is Error; in Prosecution for Murder, Where All*
   *Present Testified That Fatal Shot Was Fired From Outside*
   *House, Instruction That, if Accused, Who Was in House,*
   *Was Present, Aiding and Abetting in Killing, to Convict,*
   *Even Though He Did Not Fire Shot, Was Error.*

   It is error to instruct the jury on a proposition there is no
   evidence to support.   (p. 369.)

   (Criminal Law, 16 C. J. § 2485.)

10. SAME—*Instruction, Assuming Fact Proven as to Which There*
    *Was No Appreciable Evidence, Should be Denied; in Prose-*
    *cution for Murder, Where Accused Denied Killing, In-*

*struction That, if Jury Believed From Evidence and Circumstances Beyond Reasonable Doubt That Accused Committed Offense Without Justification or Excuse, to Convict Him, Was Error.*

An instruction which assumes a fact as proven, and as to which there is no appreciable evidence, should be denied. (p. 370.)

(Criminal Law, 16 C. J. §§ 2328, 2485.)

11.  SAME—*Instruction, Predicated on Theory Not Covered by Indictment, and Unsupported by Substantial Evidence, and Conflicting With Proper Instruction, Given on Behalf of Accused, Constitutes Reversible Error; in Prosecution for Murder, Where Conspiracy Was Not Charged in Indictment, and Was Not Supported by Evidence, Instruction, Predicated on Theory of Conspiracy, Conflicting With Instruction Given for Accused, Was Error.*

An instruction predicated on a theory not covered by indictment, and which there is no substantial evidence to support, and which conflicts with a proper instruction given on behalf of the defendant, constitutes reversible error. (p. 371.)

(Criminal Law, 16 C. J. §§ 2478, 2483, 2486.)

12.  SAME—*Instruction That Jury May Infer Malice and Intent From Use of Deadly Weapon When There Was No Evidence of Use of Deadly Weapon by Accused Constitutes Reversible Error.*

An instruction telling the jury that they may infer malice and intent from the use of a deadly weapon, where there was no evidence of the use of a deadly weapon by defendant, or of any weapon, constitutes reversible error. (p. 371.)

(Criminal Law, 16 C. J. § 2485.)

13.  HOMICIDE—*If Two or More Were Jointly Indicted for Homicide, and Were Present, and Had Equal Opportunity to Commit Offense, and No Evidence Justified Conclusion That One, Rather Than Other was Guilty, and No Evidence Justified Conclusion That Either Aided or Abetted Other, Conviction of Either Was Not Justified.*

Where two or more are indicted jointly for the crime of homicide, and all were present and had equal opportunity to commit the offense, and there is no evidence justifying the conclusion that one of them rather than the others is guilty, and no evidence that either aided or abetted the other, the jury is not justified in convicting either of the crime. (p. 373.)

(Homicide, 30 C. J. § 548.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Barbour County.

John Newman was convicted of murder in the second de-gree, and he brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*J. Blackburn Ware* and *Wm. T. George,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

MILLER, JUDGE:

Having severed in his trial, defendant was, by the verdict of the jury, found guilty, in the second degree, upon an indictment charging him, Lillie Newman, his mother, Dode Collins, his cousin, William Miner, and Tom Collins, jointly, with the murder of Steve Newman, on the 4th day of July, 1923, and was sentenced by the judgment of the circuit court complained of, to a term of eighteen years in the peniten-tiary.

The material facts and circumstances of the killing were these. On the morning of July 5, 1923, being notified of the homicide, L. N. Viquesney, a deputy sheriff, accompanied by W. Bruce Talbott, the prosecuting attorney, and Ben Wilson and Dr. W. S. Smith, went to the home of deceased, about two miles from Philippi, in Barbour County, arriving about ten o'clock, where they found the body of Newman on the bed, with his head to the foot, and his feet towards the head of the bed, lying on his right side. On examination they found a wound about two inches long and an inch and a half wide on his left breast, about an inch and a half below the nipple, and between the fifth and sixth ribs, which they con-cluded had been made by the discharge of a twelve gauge shot gun. The wound was deep, and they found a few small scattering wounds, which were manifestly made about the main one by scattering shot; and they also determined from the presence of shot under the skin on the deceased's back, that the shot had taken an upward course through the body. There was no postmortem; but the doctor was of opinion that

the shot had gone through the apex of the heart, and that death, after the shot, was almost instantaneous. Little blood was found on any of the bed clothing, and the mattress that had been on the bed had been removed, and the body replaced on a quilt or bed clothing, in the same relative position, as the defendants testified, it had occupied when they claimed the shot was fired. Some blood was found on the floor a step or two from the bed, and then twelve to fourteen feet from the bed on which the body was resting, and near the door, were evidences of large quantities of blood, which defendants testified Mrs. Newman had scrubbed up and swept into the fire place, along with some broken glass claimed by them to have been broken out of the window by the gun shot by some unknown person from the outside of the house. To account for the spilling of the blood so far from the bed, defendant and those present swore that immediately after he was shot deceased sprang from his bed, walked rapidly toward the door, and reaching the defendant Dode Collins, exclaimed: "Oh, Dode, I have been shot;" and sank down on the floor where the blood was found. Doctor Smith was of opinion that after receiving such a shot, it would have been impossible for deceased to walk from the bed to the place where the blood was found; but another doctor gave it as his opinion that it would not have been impossible; and besides, without dissection, the course of the shot after entering the body could not be determined, and that unless the heart was penetrated, with much loss of blood, it was quite possible for the deceased to have walked from the bed to the place where the blood was found on the floor.

The evidence shows that on the day of the homicide, which those present say occurred between nine and ten o'clock at night, deceased, his wife and his son John, with other friends and neighbors had attended a Fourth of July celebration at Philippi; that they had returned home before dark, Mrs. Newman going ahead of her husband and son, in Walter Croston's automobile, the others following afoot. After reaching home, according to the defendant's evidence, Mrs. Newman prepared supper. Dode Collins came in before supper. After supper, which was eaten in the kitchen, the family, including the

deceased, Mrs. Newman and John, the son, and Dode Collins went into the sitting room and sat around conversing. There were three doors to the room, one leading to the outside of the house and on to a porch, a rather delapidated one, on the side next to the public road, and on which were left only one or two planks. The road was higher than the house, which sat on the hill side. The front window was, in part at least, above the porch; it had two sashes, the glass being broken out of the lower one, which was closed with boards nailed across the same. The upper sash had six panes in it, but the lower middle glass only partly filled the opening; it lacked from three to four inches of filling the division at the top; and it was tacked, not puttied in in the usual way. The main subject of conversation seems to have been the weeding of the oats on the Boyles place. While so conversing and just as Dode Collins was about to go home, between nine and ten o'clock, according to defendants, a gun was discharged on the outside, the load coming through the window and hitting deceased as he was lying on the bed, killing him. John the son was sitting or lounging in a chair leaning against the dresser in the room. After the shooting Mrs. Newman pulled down the blind at one window, and Collins the blind at the other window above the bed; and then Mrs. Newman, accompanied by Collins, went to the home of her daughter, Mrs. Jones, who was in bed, but who arose, dressed and the three went to the home of Walter Croston, about three hundred yards distant from the Newman home, and told him what had happened; and he accompanied the three back to the Newman home. When they arrived they say they found the body of Newman still on the floor, between the bed and the door, with blood stains all the way from the bed to where the body lay on the floor. Croston, who was called as a witness for the State, swore that about the time the shot was said to have been fired, he heard the report plainly at his home; and after tests had been made of shots fired from the outside and on the inside of the house, while he was located at the same place in his house, he undertook to identify the shot outside as the plainer of the two, and as resembling the shot he heard on the night of the homicide. Croston also went with John Newman the

next morning, leaving between seven and eight o'clock, to Philippi, to inform the officers, with the result already detailed. Croston says he assisted in placing the body on the bed in the position in which the officers found it the next morning. The explanation made by Mrs. Newman and the others for not notifying the officers earlier, was that they were afraid of being killed themselves. On Croston's suggestion of blood hounds to run down the criminal who fired the shot from the outside, John said there was no certainty about blood hounds.

On the trial, the court, over the objection of defendant's counsel, admitted in evidence a piece or two of glass found on the ground outside the window through which it was claimed the shot was fired, and also a couple of pieces of glass produced by Mrs. Newman, rescued by her from the fire place, and which she represented had been swept up from under the same window on the inside of the house, into the fire place along with the blood and water on the night of the tragedy. The witness Kennedy, who produced the pieces of glass found on the outside, was permitted to compare them with those found on the inside and to testify that those found on the outside were thicker than those produced by Mrs. Newman from the inside; but we fail to find any evidence of a comparison by anyone of either of the pieces with the fragments left in the window.

There was also admitted on behalf of the State evidence of certain tests made by shots fired through glass and through the opening in a sash from several positions on the outside, not from either of the three shot guns hanging on the wall of the room where the deceased was shot, but from a shot gun of the same gauge, and the wood and paper targets used in order to determine the result on the targets and for comparison with the wound inflicted on deceased by the shot fired as represented by defendant.

There was no direct evidence of the guilt of John Newman. The State's case presented against him depends wholly on the facts and circumstances surrounding the killing, as fully detailed herein, perhaps, as is warranted by the nature and

character of the case, and as necessary to a proper disposition thereof.

The first point of error urged is the admission of the testimony of the witness L. N. Viquesney as to the finding of the glass on the outside of the window, and the admission of the glass in evidence "for what it was worth," the particular point made against the glass being that there was no evidence that these particular pieces of glass had ever been in the window, and furthermore that the undisputed testimony of defendant's witnesses was that a portion of the glass had been broken from the window for a long time before the homicide. We do not find in the evidence, except what might be inferred perhaps, that either the piece found by Viquesney on the outside or those produced by Mrs. Newman or defendant as having fallen on the inside at the time of the shot, was compared with and found corresponding in thickness with the fragments of glass left in the window, so as to determine whether either of the pieces belonging to or were parts of glass from the window sash. However, the evidence is conflicting as to whether any part of the broken pane remained in the sash on the morning after the officers went to the house. Some of the witnesses say a part was left in; others that it was all out. The officers found no glass on the floor inside the house, except that the witness Kennedy says he thinks he picked up a piece of glass, not under the window, but under the lounge in the room. This evidence was intended to impeach the testimony of defendant and others, that the shot that killed Newman came through the pane of glass in the window. It had very little probative value on this question, but it did bear somewhat thereon. The court admitted this evidence for what it was worth. All agree that pieces of glass were picked up by Mrs. Newman out of the fire place and delivered to the officers. As all the evidence on the subject went to the jury, we can not say the court committed any error in its rulings.

The next point of error relates to the admission of evidence of experimental shots fired outside of the house, and the targets produced thereby, in an effort on the part of the State to show, in connection with the opinion evidence of Doctor Smith

and others, that the wounds found in the body of Newman could not have been inflicted by a gun shot fired from the outside as claimed by defendant and his witnesses. These targets, though before the court and jury, are not before us; and we are poorly advised by the evidence in relation thereto, as to what they actually showed. Three reasons are advanced against this evidence, viz: (1) Because not made in the presence of the accused; (2) Because not made under any order of court; (3) Because not made under like conditions existing when the shot that killed Newman was fired. And another point relied on is that the objections were waived, because not interposed on the trial. The latter position is without merit, for the reason that although no specific objections were interposed at the time the evidence was first offered, a motion was made to exclude or to strike out at the conclusion of the evidence, which was overruled, as shown by defendant's bill of exceptions number four.

The proper admission of evidence of experiments is not limited to those made in the presence of the accused, nor to those made in the presence of, or pursuant to an order of court. 5 Enc. Evidence, 476, 477. The court by its ruling seems to have admitted the evidence respecting the targets simply as illustrations, and apparently not as demonstrations. But when an experiment is offered in proof of an alleged fact, it should be shown that the experiment was performed under conditions substantially similar to those admitted or proved to have existed, or in disproof thereof, that a result was obtained different from the alleged fact by an experiment performed under similar conditions. 5 Enc. Evidence, 482, paragraph 3, and cases cited.

While there is no fixed standard, says this authority, for determining the degree of similarity required, since the circumstances of each case are usually different, the rule as generally stated is that the conditions must be substantially or proximately similar, and that the similarity need extend only to those conditions which govern or substantially affect the result. 5 Enc. Evidence, 485, and cases cited.

And the criterion for the admissibility of such evidence is whether it tends to enlighten the jury and enable them more

intelligently to consider the issues presented. And whether or not such evidence of experiments is admissible is, under the circumstances of each case, a preliminary question for the determination of the court, in the exercise of its discretion, and which ought not to be interfered with by an appellate court, unless an abuse is made clearly to appear. 22 C. J. pp. 755, 756, §§ 843, 844; *Chicago, St. Louis & Pgh. R. Co.* v. *Champion,* (Ind.) 23 L. R. A. 861.

Judged by the requirements of this rule how does the evidence of these experiments measure up to it? A map or diagram made by the witness Kennedy from measurements taken by him, and referred to in connection with his testimony relating to his experiments, does not seem to have been formally introduced in evidence, but supposedly it represented the room in which Newman was killed, and the distance of the bed from the door and window fronting on the public road, and also the distance from the bed to where the larger quantity of blood had been shed; but the evidence is not clear on this question. A shot gun, twelve gauge, similar to the three found on the wall in the room, was used, not either of the three found there; the size of the shot used in the experiments, according to the witness Kennedy, was numbers 5 and 6, number five according to Webster's dictionary being 12/100 of an inch in diameter, and number 6 being 11/100 of an inch, indicating pretty large shot, the smallest bird shot being 5/100 or 1/20 of an inch. Kennedy's opinion was that the shot in Newman's body were number 5 or number 6, but he didn't know certainly; nor was it shown whether the powder was white or black powder. The witness identified a sash which he had used in the experiments, and out of which he said he shot glass of different thicknesses, one described as thin glass, the other thick; but what the size of the sash or glass was, does not appear, except as it may have appeared to the jury; it is not before us. There appear to have been five of the targets. The first represented the result of a shot fired from the upper door, fourteen feet two inches, into the target, but not through glass; the second was made from a shot fired from the same distance through the thick glass, three feet away from the glass; the third target represented the result

of a shot fired the same distance, one foot from the glass; the fourth represented the result of a shot fired the same distance through an extra thick glass, three feet from the glass; the fifth showed the result of a shot through no glass, six feet from the target. No witness proved, of course, from what standpoint the fatal shot was fired, if fired from the outside, whether from the porch or from the hill side above it, or while standing on the ground in close proximity to the window. Kennedy was asked if he had ever stood out on the road and determined whether a man could be seen from that point, lying on the bed in the room where they found Newman's body, implying that if he could have been seen, he might have been shot from the road; and he answered that he had not. The size of the shot found in Newman's body was not shown, nor any estimate thereof given by any witness. Kennedy said the targets were made of cardboard, and that he had never experimented on firing a shot into the flesh between the ribs and didn't know what the effect would be; and from his evidence on cross-examination, it would seem that the tests or experiments were made, not in the room, but up the pike there somewhere. He admitted that some shot guns of the same calibre scattered more than others, and that the size of the shot used will give different results. The sash, as the cross-examination showed, was not installed in the wall of the house, but was set upright on a box, just propped up, not fastened to anything. According to the evidence, the circumstances and conditions of these experiments bore slight resemblance to those supposed, or which defendant's evidence tended to show were present when the killing took place. Spillman, who Kennedy says was present at these experiments, was not called as a witness.

But the attorney general says that by introducing evidence of the same class, the defendant thereby waived his objection to the State's testimony concerning these experiments, referring no doubt to some experiments conducted by Walter Croston, a witness called by the State, brought out on cross-examination, as to the difference in the character of the report of a gun fired on the outside of the Newman house and one fired on the inside, already referred to. But this evidence,

brought out on cross-examination, was not upon the same sub-
ject as the evidence objected to, and we do not think defendant
thereby waived his objection to the targets and the State's
evidence relating thereto. The attorney general cites us to
*Starcher* v. *South Penn Oil Company,* 81 W. Va. 857, on the
question of waiver in such cases. The point of decision in
that case did not relate to experiments, but to evidence on
the very same subject offered by defendant. In *Merrill* v.
*Torpedo Co.,* 79 W. Va. 669, cited in the *Starcher-South Penn*
case, the evidence objected to was some photographs of a
similar explosion put off from the same place as the one
involved, and admitted simply to show the violence of the
explosion and the effect it produced to the injured house and
water tank near by, the court saying, however, that it fur-
nished no proof on the vital question in the case. So we hold
that the evidence of the alleged experiments furnished no
evidence of probative value on the vital question in this case,
namely, whether Newman could have been shot, and the shot
have had the effect shown upon the body, if fired, as de-
fendant contends from some point on the outside of the house.
In our opinion this evidence, tended rather to confuse than to
enlighten the jury on the vital question in the case, and should
not have been admitted, whether as illustrations or supposed
demonstrations, and if so, under the rule stated, should have
been disallowed. Other cases illustrating the impropriety of
admitting evidence of cardboard targets produced by gun
shots in the manner shown in this case, cited by defendant's
counsel, are: *State* v. *Justus,* 11 Oregon, 178; 50 Am. Rep.
470; *People* v. *Wagner,* (Cal.) 155 Pac. 649; *Hisler* v. *State,*
52 Fla. 30.

Another point of error relied on in argument and in brief
of counsel, was the admission of the following evidence of
Dode Collins, a witness for defendant, brought out on cross-
examination by the State, and not the subject of any inquiry
by defendant's counsel: "Q. You know about the trouble
John and his father had at the time John drew the knife after
him? A. No, sir, I didn't know. Q. Ever hear of it? A. I
heard of it." There was no evidence of any kind except this as
to John drawing a knife on his father. It requires no argu-

ment or citation of authority to show the impropriety of this evidence; at most it was hearsay, and very poor evidence of that character. What was it the witness heard, and from whom? While the witness was a co-indictee with defendant on the trial, he was not a party to the case on trial. If a party to such case desires to examine a witness on a subject not brought out on examination in chief, he should introduce him as his own witness in the subsequent progress of the trial. *State* v. *Price*, 92 W. Va. 542; *Prunty* v. *Traction Company*, 90 W. Va. 194; *State* v. *Hatfield*, 48 W. Va. 561; *State* v. *White*, 81 W. Va. 516. Of the same character of evidence which the State undertook to introduce, implied, not from the answers, but from the questions propounded by the prosecuting attorney, was the suggestion that defendant and his father had quarreled the night of the homicide, about the weeding of the oats. All the witnesses present denied that any such quarrel had ensued from the talk about the oats.

We next come to the points of error respecting the instructions to the jury, given and refused. First, as to State's instruction number one, objected to. It told the jury that if they believed from the evidence beyond a reasonable doubt that defendant was present aiding and abetting at the killing of deceased, then they might find him guilty though he may not have fired the fatal shot. If the fatal shot was fired from the outside of the house, as all present swore, there is not a particle of evidence justifying the conclusion that John Newman was present aiding and abetting in the killing. And no witness swears that any one of those present in the room fired the shot that killed deceased. They were all jointly indicted, but not for conspiracy to kill the deceased. The record is wanting of any evidence to show any motive pointing to one rather than to any of the others, for committing the crime, and there was none implicating either of them. The giving of this instruction implied that there was at least some evidence justifying it, when in fact there was absolutely none. The proposition, as so often before, need not again be affirmed, that it is error to give an instruction which there is no evidence to support. Enc. Dig, Va. & W. Va. Rep., 3 Cum. Sup. 738.

The point made against State's instruction number two, relating to circumstantial evidence, is that it did not in terms limit the jury to such circumstances as were shown in evidence, but gave them liberty to go outside the evidence and consider any circumstances whether shown in the evidence or not. We do not think the instruction amenable to this criticism. It may be abstract, but is not erroneous as a correct proposition of law. It is substantially the same as the one approved in *State* v. *Sheppard*, 49 W. Va. 582, 607.

Instruction number three given on behalf of the State, on the subject of reasonable doubt, is the same as the one often criticised, but never as yet regarded as good cause for reversal. The objection to it as being abstract, is apparently not seriously relied on.

State's instruction number seven, given, is the one most objected to. After adverting to the physical condition of the room and to the value of circumstantial evidence, and emphasizing the physical facts surrounding the crime, it proceeds to tell the jury that they had the right to convict defendant on circumstantial evidence alone, or upon circumstantial evidence coupled with other evidence, and that therefore, if they believed from the evidence and circumstances of the case beyond a reasonable doubt that defendant did commit the crime charged against him in the indictment, without justification or excuse, then it was their duty to find him guilty and fix the degree of murder as the evidence might warrant. The particular points of criticism are: (1) that it singles out the physical condition of the room and the physical facts surrounding the scene of the crime, and, (2) assumes as a fact proven, that defendant killed deceased without justification or excuse, giving the physical conditions of the room undue prominence. We observe that the physical conditions of the room and the physical facts surrounding the scene of the crime were just as pertinent to either of the other persons present in the room as to the defendant on trial, and for the most part they were just as well accounted for on defendant's theory that the fatal shot was fired from the outside by an unknown person, as upon the theory of the State that defendant committed the offense. There was no attempt by

defendant to justify the killing of his father; he denied it; and there was no evidence in the case warranting an instruction on this subject. An instruction which assumes a fact as proven, as to which there is little, if any, appreciable evidence, should be rejected. *Williams* v. *Schehl,* 84 W. Va. 499.

The next point of error is that the trial court should have rejected State's instruction number ten, because not justified by the indictment, nor by the evidence, and wholly in conflict with defendant's instruction number ten, also given, and which correctly propounded the law applicable to the offense alleged, when justified by the evidence in the case. State's instruction number ten was predicated on the theory of a conspiracy to kill the deceased, not charged in the indictment, and as to which there is no evidence warranting it. There is not a particle of evidence to justify the jury in finding that a conspiracy existed between the defendants in the indictment, or that the killing of the deceased was done pursuant thereto. Defendant's instruction number ten was: "The court instructs the jury that the defendant is not being tried on the charge of having conspired with others to take the life of Stephen Newman, but he is charged with, and being tried for the murder of Steven Newman, and you can not find him guilty in this case of having entered into a conspiracy to commit such murder, and can not find him guilty of murder in this case without you believe, beyond a reasonable doubt that he fired the shot which took the life of Stephen Newman, or that being present he aided and abetted the murderer in doing so, and unless you so believe from the evidence, beyond all reasonable doubt, you must find the defendant not guilty." State's instruction number ten was directly in conflict with defendant's instruction number ten, and of course should have been rejected. The former would have allowed the jury to find defendant guilty, if they could from the evidence find the existence of a conspiracy between any two of the other defendants, and the presence of John Newman when the fatal shot was fired by either of the conspirators, and whether or not he had any part therein. And the last clause thereof erroneously told the jury that from the use of a deadly weapon, unless circumstances of *explanation* and mitifiation

were proven, they might infer or presume from the use of such deadly weapon the existence of intent, malice, design and premeditation essential to culpable homiicide. There having been absolutely no proof of the use of a deadly weapon by defendant, the instruction was unjustified on the theory of motive and intent.

Instructions numbers eleven and twelve given on behalf of the State are complained of. Number eleven singled out the testimony of Smith, the physician, and told the jury they had the right to take this evidence into consideration, and that if they found that deceased could not have done what defendant and others said he did after sustaining the gun shot wound, they should take this fact into consideration in determining the guilt or innocence of the defendant. Of course, if there was any evidence justifying the conclusion that defendant killed deceased, they were justified in considering the possibility or impossibility of deceased's doing the subsequent act described, but there was no evidence in the case pointing to him as the slayer of his father. Reference in the instruction to Dr. Smith's opinion on this subject put too much emphasis on such opinion, which was not controlling, especially when another witness gave a different opinion. It was too suggestive of an opinion by the trial judge based thereon, of defendant's guilt. What one could do after receiving such a shot is too problematic as a fact on which to convict one of crime. For illustration, we have in this state a case where a police officer, after sustaining a fatal shot, turned about and with a gun in his own hand inflicted upon himself a mortal wound from which he probably died, though it was a question before the jury which of the two shots was the one that ended his life. *State* v. *Angelina,* 73 W. Va. 146.

Instruction number twelve erroneously gave to the jury the right to infer malice and intent with deliberation from the fact of the killing with a deadly weapon, when unaccompanied by palliatory circumstances, the burden of showing which was placed on the accused, when there was no evidence justifying the conclusion that defendant had shot his father with a deadly weapon.

A proposition applicable to both instructions eleven and twelve, condemning them, is that where one is indicted jointly with others as principal, as in this case, and they are tried separately, and all had the same opportunity to commit the offense, if upon the whole evidence there remains a reasonable doubt as to which of the two or more committed the act, the defendant can not be convicted unless it appears that one of the others did the killing, and the prisoner aided and abetted in the commission of the act. These and perhaps others of the State's instructions assume that all of the accused being present, but none of them being shown to have committed the crime, and all uniting in denying it, the jury were justified in concluding that one of these did it and that the others were aiders and abettors, a non sequitur, and liable to mislead the jury to a wrong conclusion. *State* v. *Cremeans,* 62 W. Va. 134; *State* v. *Roberts,* 50 W. Va. 422. And what we have observed about these instructions is applicable also to State's instructions numbers seventeen and eighteen, considering these also in their application to the evidence in this case.

The last point urged with reference to the instructions relates to the refusal of the court to give as requested, and modifying and giving as so modified one of defendant's instructions, and its refusal to give number 8a. The record does not identify either the modified instruction or the one rejected, as 8a. However, the seventeen instructions given seem fully to cover the subject matter of the one modified and the one refused, and to fully cover every phase of the law of homicide involved; and we find no prejudicial error in the action of the court respecting either the modified or the rejected instruction.

Upon the whole case and for the errors pointed out herein, we are of opinion to reverse the judgment, set aside the verdict, and award the defendant a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*