STATE OF WEST VIRGINIA

v.

KATHERINE PERKINS

(No. 9896)

Submitted September 17, 1947.   Decided November 11, 1947.

*F. F. Scaggs*, for plaintiff in error.

*Ira J. Partlow*, Attorney General, and *J. Chandler Curd*, Assistant Attorney General, for defendant in error.

KENNA, JUDGE:

Katherine Perkins was indicted by a grand jury of Wayne County for the murder of her husband, P. P. Perkins. She pleaded not guilty, was tried and convicted of murder of the second degree, and sentenced to imprisonment for a term of five to eighteen years. She brings the case here by writ of error.

On the evening of September 1, 1944, defendant, while riding in the automobile of a friend on Monroe Avenue in the City of Huntington, observed her husband in his automobile embracing a woman. At the request of defendant, the automobile was stopped, and defendant then went to the vehicle in which her husband and his companion were seated, and there engaged in a fight with the woman. The husband interfered in the struggle, enjoined defendant not to hurt his companion, and finally hit and kicked defendant several times. The defendant reentered her friend's automobile and returned to her home in the Town of Ceredo.

About ten o'clock p. m. of the same day, the husband returned to his home, and, according to defendant's testimony, he was angry and inclined to be violent. The quarrel between defendant and her husband was renewed and ended by the husband striking and kicking the defendant. After committing the second assault on defendant, the husband left his home and did not return until about midnight. Upon his return home he occupied a room on the second floor of his residence different from that which he and defendant had been wont to occupy. The defendant slept for the greater portion of the night in the room of her son and daughter-in-law.

On the morning of September 2, 1944, defendant pre-

pared breakfast for a boarder, herself and her family. She and her daughter-in-law ate breakfast together, after which defendant went to the business section of the town for the purpose of paying a grocery bill. At some time during the morning defendant went to the home of a witness who testified for the State, where the witness said she saw a firearm in the possession of defendant, and that defendant indicated that trouble was about to occur.

Defendant returned to her home, went to an upstairs bedroom, and began combing her hair. While doing so her husband came to the door; severely criticized defendant on her conduct in fighting the night before; said in substance that he was not further interested as he was leaving, and started toward defendant, saying, "I will break your God damned neck."

The record is not clear as to what took place after the threat had been made by the husband. Defendant does not admit shooting her husband, but it is a reasonable inference, well supported by the facts, that she shot the deceased three times. One bullet entered his right shoulder, one about the middle of his right thigh, and another at the ninth dorsal vertebra. All bullets entered from the back. It is also a reasonable inference that defendant shot herself in the forehead, a pistol having been found near her body in the upstairs hall, and she was bleeding from a gunshot wound in her head.

The pistol found near defendant's body was offered as an exhibit, and was fairly well identified as belonging to a boarder and roomer, who stayed at the home of defendant and her husband, and whose room was on the first floor thereof. The neighbors of defendant were summoned and upon their arrival at the scene of the shooting, the husband, who had fallen down the stairway to the first floor, requested them to go upstairs and see about "Kate," adding that he was to blame for the shooting. Another witness testified that on the way to the hospital in the ambulance defendant stated she was sorry she had not killed her husband and applied to him a vile epithet.

The husband was taken to a hospital, where he remained under treatment until the 8th day of April, 1945, when he left the hospital and returned to his home, where he died on April 16, 1945.

Defendant contends that the court committed the following errors: (1) In permitting an attending physician, prior to any proof of the cause of death, to give in evidence his opinion as to the cause of deceased's death; (2) in refusing to give defendant's instruction No. 3; and (3) by overruling defendant's objection to the cross-examination of defendant by the judge.

A physician who attended the deceased during the time he was in the hospital was introduced by the State to show the cause of death. The following question was asked: "Assuming the death of Plummer, or P. P. Perkins, to have been on April 16, 1945, basing your answer upon your experience and observation of this particular case in your hospital, what, in your opinion, was the cause of his death?" Defendant's objection to the foregoing question having been overruled, she now contends that the question was hypothetical and that the hypothesis on which the question was based had not been proved. We do not agree with that contention. The physician had testified before the above question was asked that the wound in the dorsal vertebra was the *fatal* wound, and that the death of decedent was caused by exhaustion due to sepsis, the result of the gunshot wound. Furthermore, before the question was asked and answered, the State introduced a portion of the public record showing that the death of deceased was caused by exhaustion. Proof of the cause of deceased's death was timely offered, and such proof constituted a sufficient factual premise for a hypothetical question, if such question had been asked.

But the question here objected to is not hypothetical. True, the physician was asked to assume that deceased died on April 16, 1945, but the date of the deceased's death had already been established by undisputed proof. Certainly, the physician who attended and treated deceased

knew of his death and probably knew the date thereof, deceased having died about eight days after he left the hospital. The physician, having personal knowledge acquired by his own observation, knew the cause of death, was not precluded from answering the question, and could testify directly as to the cause of death. 2 Wharton's Criminal Evidence, 11th Ed., Section 1021; Underhill's Criminal Evidence, 4th Ed., Section 237. In support of her contention that the question and answer were improper, defendant cites the case of *State* v. *Barker,* 128 W. Va. 744, 38 S. E. 2d 346. This Court, in considering a hypothetical question propounded in the *Barker* case, held that it was error "* * * to permit a hypothetical question, bearing on the cause of decedent's death, to be addressed to a medical witness, which question contains a factual assumption concerning which there is no evidence or admission." In the case at bar the only assumption contained in the question objected to concerned the date of deceased's death. The fact of his death, the date of his death, and the cause of his death, had been established prior to the asking of the question objected to by defendant. The trial court ruled properly in admitting the testimony of the physician as to the cause of deceased's death.

The court refused to give defendant's instructions Nos. 3, 7, 8, and 9. However, the only error assigned with reference to such refusal relates to instruction No. 3, and, therefore, we shall only discuss the action of the court with reference to said instruction.

Instruction No. 3 embodied a statement of the law of self-defense. The instruction was refused on the ground that there was no evidence, either on the part of the State or defendant, supporting an instruction on self-defense. The record in this case has been carefully examined. The acts of violence perpetrated by the deceased on defendant on the night preceding the shooting, as well as the threat made by deceased just prior thereto, have been considered. Mere words, unaccompanied by an overt act, are not sufficient to justify an instruction to the jury on the theory of self-defense. *State* v. *Snider,* 81 W. Va. 522, 94 S. E. 981.

Defendant was probably smarting from the indignities occasioned by the two assaults committed on her prior to the shooting, but when the deceased encountered defendant at the time of the shooting, there was no overt act committed by deceased. There is testimony that he started toward defendant at the time of the threat but that fact does not constitute an overt act. The record does not disclose what took place after the threat was made, as the defendant states that her mind is blank as to what was done by her or the deceased after the threat. Instruction No. 3 assumes that deceased made an attack on defendant. There is no showing of such fact in the record, nor is there sufficient evidence which tends to prove that such attack was made. The instruction comes within the rule laid down in the third point of the syllabus in *State* v. *Barker*, 92 W. Va. 583, 115 S. E. 421. See *State* v. *Weissengoff*, 89 W. Va. 279, 109 S. E. 707; *State* v. *Frank Zinn*, 95 W. Va. 148, 120 S. E. 387; *State* v. *Newman*, 101 W. Va. 356, 132 S. E. 728.

Facts necessary to support the theory of self-defense are not shown in this record. On the contrary, it is undisputed that all of the bullets inflicting wounds on deceased entered from the rear, which militates against the idea that deceased had assumed an aggressive attitude toward defendant at the time of the shooting. The refusal of the trial court to give defendant's instruction No. 3 is not error.

Defendant testified in her own behalf. At the commencement of her re-direct examination, her counsel asked one question, which she did not answer. At that time the judge of the trial court commenced to cross-examine defendant in the presence of the jury and asked, without intermission, forty-one questions. It would unduly prolong this opinion to quote all the questions asked by the judge and answered by defendant. Such questions related to the ownership of the revolver, and also how the revolver came to be on the second floor when the room of the owner thereof was on the first floor. The cross-examination also elicited the fact that defendant had made

the roomer's bed on the morning of the shooting; that deceased was shot three times in the back; and that defendant also suffered a gunshot wound.

After developing these two subjects, the judge of the trial court then asked defendant the following questions:

"Q. Mrs. Perkins, you have told the jury you had a black-out up there on the evening when you found your husband with this woman and you don't remember anything except what your husband did to you, is that right?

"A. That is right, exactly right.

"Q. You remember everything that happened from then on until this shooting?

"A. Yes, sir.

"Q. You remember your husband standing with a flashlight in his hand and his gun in his hand?

"A. Yes, sir.

"Q. You remember that?

"A. Yes, sir.

"Q. Then you testified to the jury that you had a black-out from that time on, is that right?

"A. Yes, sir.

"Q. You don't know what happened?

"A. I don't remember anything that happened until late that evening in the hospital.

"Q. When that blackout struck you where were you standing?

"A. In the doorway.

"Q. Room No. 2?

"A. Yes, sir.

"Q. Where was he?

"A. In the hall.

"Q. Facing each other?

"A. Yes.

"Q. And you don't know how that gun which has been exhibited in evidence got there in the hallway and found there after you were shot?

"A. I don't remember ever having that gun in my hands.

"Q. You didn't · have a blackout except on those two occasions, is that right?

"A. I don't understand what you mean.

"Q. You told the jury your mind was a blank at the time of the trouble with this woman, now you tell the jury your mind was a blank from the time your husband was standing there in the hall and you were in the room facing him.

"A. I guess I was so mad, I don't know anything else."

Thereupon defendant objected to the questions asked by the trial judge and rested her case.

The question presented by the third assignment of error has been before this Court several times. In disposing of a similar question presented in the case of *State* v. *Hurst,* 11 W. Va. 54, this Court laid down the following rule: "It is error for a court in the trial of a criminal cause, to make a remark to, or in the presence of the jury, in reference to matters of fact, which might in any degree influence them in their verdict." In the case of *State* v. *Thompson,* 21 W. Va. 741, 756, this Court again adverted to the rule laid down in the *Hurst* case.

The rule is amplified and restated in the seventh point of the syllabus in the case of *State* v. *Austin,* 93 W. Va. 704, 117 S. E. 607, as follows: "In the trial of a criminal case, the jurors, not the court, are the triers of the facts, and the court should be extremely cautious not to intimate in any manner, by word, tone, or demeanor, his opinion upon any fact in issue." In the case of *State* v. *Hively,* 103 W. Va. 237, 136 S. E. 862, this Court held: "Under the practice in this State, the trial judge should ex-

press to the jury no opinion on the testimony, either directly or by innuendo."

The action of the trial judge in the case of *State* v. *Songer,* 117 W. Va. 529, 186 S. E. 118, was somewhat similar to that of the trial judge in the instant case. In the *Songer* case, this Court, citing with approval the case of *State* ιv. *Austin, supra,* reversed the trial court, using the following language: "Edgar Martin was a witness for the State though friendly to defendant. The court virtually conducted his examination in chief asking him in all, sixty questions. Reed Mullens was a witness for defendant. Reed testified (without objection) that he did not know they were stealing the car; that Martin told him Bias had the car borrowed. (Martin was not questioned on that point). While Reed's examination in chief was in progress, the court interposed and asked him thirty-three questions. Upon Reed's cross-examination, the court again asked a number of questions. Some of the court's questions were brusque and his interrogations generally, both of Martin and Mullens, tended to indicate to the jury that he did not credit the innocence of defendant. This was prejudicial error."

For other cases discussing this principle, see *State* v. *Staley,* 45 W. Va. 792, 804, 32 S. E. 198; *State* v. *Edgell,* 94 W. Va. 198, 210, 118 S. E. 144; *State* v. *Willey,* 97 W. Va. 253, 259, 125 S. E. 83; *State* v. *Waters,* 104 W. Va. 433, 437, 140 S. E. 139, *State* v. *Summers,* 118 W. Va. 118, 121, 188 S. E. 873; *State* v. *Wallace,* 118 W. Va. 127, 132, 189 S. E. 104.

This Court has applied the same rule to bastardy proceedings, in *Ball* v. *Wilson,* 98 W. Va. 211, 213, 127 S. E. 22, and to civil cases, *Neill* v. *Rodgers Bro's. Prod. Co.,* 38 W. Va. 228, 18 S. E. 563; *Road Com.* v. *Young,* 100 W. Va. 394, 130 S. E. 478.

In this case the demeanor of the trial judge is not portrayed by the record, nor is it shown whether the questions were brusque or otherwise. But it suffices to say that the trial judge in this case conducted a vigorous,

searching and sustained cross-examination of the defendant. Upon consideration of any single question, we could not say that there was prejudice. But upon consideration of the forty-one questions asked defendant by the trial judge, the conclusion is inescapable that the trial judge by such cross-examination of defendant in the manner here shown intimated to the jury his opinion upon the facts in issue.

We cannot say to what extent the minds of the jurors who tried defendant were influenced by the cross-examination conducted by the trial judge, but we must assume that if the trial judge indicated to the jury his belief in her guilt, such belief influenced the jury in arriving at its verdict.

We do not intend to say that a trial judge should not ask questions during the progress of a criminal trial at proper times and in a proper manner. Clarifying questions are necessary, but we see no occasion for the trial judge to take over the duties of a prosecuting officer.

In accordance with the foregoing we reverse the judgment of the Circuit Court of Wayne County, set aside the verdict, and award the defendant a new trial.

> *Judgment reversed; verdict set aside; new trial awarded.*

HAYMOND, JUDGE, dissenting:

Though I fully agree with the principle stated in the syllabus, it does not apply to the situation which existed, as shown by the record, in the trial of this case. For that reason I dissent from the decision of the majority.

In my opinion the defendant had a fair trial which was free from prejudicial error and in which the evidence was ample to support the verdict of the jury finding her guilty of murder of the second degree. The sole ground upon which the majority sets aside that verdict and reverses the judgment is the action of the trial judge in propound-

ing certain questions to the defendant while she was testifying in her own behalf after examination by her attorney and cross-examination by the prosecuting attorney had not succeeded in developing pertinent facts relative to her conduct shortly before or at the time she shot and killed her husband. I emphatically disapprove any act or conduct of a judge of any trial court which indicates the slightest bias or unfairness toward any party or any opinion entertained by him with respect to any factual question, and I would promptly act to reverse the judgment and award a new trial whenever behavior of that nature occurs. But I would not require a judge of a trial court to act the part of a mere umpire in charge of a game between contestants or deprive him of his unquestioned right and duty to exercise his judicial power to direct and conduct the trial of a case. A trial is not a game. It is a solemn judicial inquiry to determine the merits of the conflicting claims of the parties for the sole purpose of administering justice between them according to law and the right of the case.

The judge of a trial court should, at all times, carefully refrain from encroachment upon the function of the attorneys who represent the litigants. Rarely should he engage in the examination of witnesses. That is the work of counsel. When, however, a witness is unwilling to tell the facts within his knowledge, and counsel are not disposed, or are unable, to elicit the facts, it may be proper for the judge, within recognized limits, to interrogate a witness. In such instances his failure to do so would risk his proper control of the case or require him to submit to the whim of an unruly witness. He is not required to do either.

The defendant in this case was unwilling to tell the whole story. She had not responded fully or frankly to the questions asked by counsel. Though the numerous questions propounded by the trial judge were limited to a few related facts, and indicated persistency beyond the point of cautiousness, they were not unfair or improper, they showed no bias or prejudice for or against the de-

fendant and they did not intimate any view as to her guilt or her innocence, or as to any other issue of fact. The majority opinion concedes that no prejudice resulted from any single question, but it concludes that the number, there being forty-one, intimated the opinion of the trial judge to the jury. The majority, however, does not indicate what that opinion was. It is difficult to understand how, without more, questions which singly are not prejudicial, collectively are so; or to determine, without further basis of description, what was the opinion which the trial judge, by the questions considered collectively, is said to have intimated to the jury. The record does not portray the demeanor of the trial judge at the time he interrogated the defendant. I can not say that he had any opinion as to any issue of fact, or if he entertained any opinion, what that opinion was; and I doubt if even the jury thought otherwise.

I am unable to find, in this record, any act of the circuit judge who conducted the trial of this case indicative of any partiality or lack of fairness upon his part toward either party, or any conduct by which any opinion entertained by him concerning the guilt or the innocence of the defendant, or as to any other fact, was or could have been communicated or disclosed to the jury. Nothing prejudicial to any right of the defendant appears to have resulted from the conduct of the trial judge.

The defendant was fairly tried. The verdict of guilty ▪of murder of the second degree was fully warranted by the evidence. In fact, upon the evidence, a verdict for any offense less than murder, or of not guilty, would not have been justified. The verdict was approved by the court and a proper judgment was rendered upon it. Perceiving no prejudice or injustice to the defendant, I am unwilling to disturb that judgment.

I am authorized to say that Judge Fox concurs in the views expressed in this dissent.